**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALBERTO PEÑA, individually and on behalf of all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| SURGICAL CARE AFFILIATES, LLC; SCAI HOLDINGS, LLC; UNITEDHEALTH GROUP, INC., DAVITA, INC., UNITED SURGICAL PARTNERS HOLDING COMPANY, INC., UNITED SURGICAL PARTNERS INTERNATIONAL, INC., TENET HEALTHCARE CORPORATION, and JOHN DOE 1, | |
| Defendants. | |

Plaintiff Alberto Peña, by way of complaint against defendants Surgical Care Affiliates, LLC, SCAI Holdings, LLC, UnitedHealth Group, Inc., (collectively "SCA"), DaVita, Inc. ("DaVita"), United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc., Tenet Healthcare Corporation (collectively "USPI"), and John Does 1, alleges as follows:

### Nature of the Action

1.      Competition is the guiding light of our economy. Competition leads to better product safety and quality, and it also leads to better service and lower prices. In order to put themselves in the best position to lead their respective industry, companies compete for the services of employees that will help them accomplish their competitive objectives. A competitive industry also has a competitive labor market.

1

2.       Some companies in certain sectors of the economy have, from time to time, sought to reduce the cost of labor and decrease employee mobility by reaching agreements with their competitors not to hire each other's employees. These so-called "no-poach" agreements are increasingly recognized by antitrust enforcement authorities as per se violations of the antitrust laws. As the Antitrust Division of the United States Department of Justices has noted, "[w]hen companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. The same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services. After all, workers, like consumers, are entitled to the benefits of a competitive market. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[1]

3.       This case involves years-long no-poach agreements between Defendants, and these particular no-poach agreements led to a DOJ investigation and announcement on January 7, 2021,that it had secured a grand jury indictment against Defendant Surgical Care Affiliates, LLC, and SCAI Holdings, LLC. The no poach agreement between SCA and its coconspirators had been successfully concealed until the DOJ's January 7, 2021, announcement, which publicly disclosed, for the first time, the no-poach agreement alleged among Defendants.

4.       The DOJ alleges in the indictment that SCA conspired with its competitors, identified by the DOJ as "Company A" and "Company B," to refrain from soliciting or hiring each other's senior-level employees ("director level" and above) absent notifying and obtaining consent from their current employers. *See United States of America v. Surgical Care Affiliates,*

---

[1] https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements, last accessed on June 30, 2021.

*LLC, et al.*, No. 3-21 cr0011-L (N.D. Tex.) (filed Jan. 5, 2021). On information and belief, Plaintiffs allege that "Company A" is USPI and that "Company B" is DaVita. The conspiracy is alleged to have started as early as 2010 and lasted at least until 2017. SCA and its co-conspirators USPI and DaVita are the largest operators of out-patient medical care facilities in the United States.

5.      The DOJ announced on July 15, 2021, that a federal grand jury returned a two-count indictment charging DaVita and its former CEO, Kent Thiry, for conspiring with competing employers, one of whom is SCA, not to solicit certain employees, confirming Plaintiff's belief.

6.      The no-poach agreements between them were not necessary to accomplish or put in place any legitimate business transaction or lawful collaboration among the companies. Defendants' conspiracy was strictly a tool to suppress their senior-level employees' mobility and compensation, and hence their own expenses.

7.      These no-poach agreements accomplished their purpose. They reduced competition for Defendants' senior-level employees and suppressed Defendants' senior-level employee compensation below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, their current and prospective senior-level employees.

8.      Defendants' agreements also denied their senior-level employees access to job opportunities, restricted their mobility, and deprived them of significant information that they could have used to negotiate for better compensation and terms of employment.

**Jurisdiction and Venue**

9.      Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiff and members of the Class sustained as a result of Defendants' violations.

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

11.     This Court has personal jurisdiction over Defendants because, among other things, they (a) transacted business throughout the United States, including in this District; (b) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; (c) had substantial contact in various states in the United States, including in this District; and (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this in the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, Defendants resided or transacted business in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

**Parties**

13.     Plaintiff Alberto Peña is a resident of Texas.  He was employed by DaVita in Texas from approximately July 2006 to June 2019 and was held out to the public as a first as a

4

facility administrator, and spent the last seven years of his employment with DaVita as a Regional Operations Director

14.     Defendant Surgical Care Affiliates, LLC, was a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and Deerfield, Illinois. Surgical Care Affiliates, LLC is a wholly owned subsidiary of UnitedHealth Group, Inc.

15.     Defendant SCAI Holdings, LLC, is a company organized and existing under the laws of Delaware with its principal place of business in Deerfield, Illinois, and is the successor entity to Surgical Care Affiliates, LLC. SCAI Holdings, LLC is a wholly owned subsidiary of UnitedHealth Group, Inc. Collectively, the defendants did business as Surgical Care Affiliates ("SCA"). SCA owned and operated outpatient medical care facilities across the United States and employed individuals to operate its business at its headquarters locations and at other locations across the United States.

16.     Defendant UnitedHealth Group, Inc. ("UHG") is a company organized and existing under the laws of Delaware, with its principal place of business at 9900 Bren Road East, UnitedHealth Group Center, Minnetonka, MN 55343. Andrew Hayek was Chairman and Chief Executive Officer of SCA from 2008 until 2017. In 2017, he became Chief Executive Officer of UHG affiliate OptumHealth. In 2019, he became Executive Vice President of UHG affiliate Optum. Upon information and belief, Hayek is referred to as "Individual 1" in the DOJ indictment.

17.     Defendant DaVita, Inc. ("DaVita"), is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. DaVita owns and operates outpatient medical care facilities across the United States and employs individuals to

5

operate its business at its headquarters location and at other location across the United States. Upon information and belief, DaVita is referenced as "Company B" in the January 5, 2021, DOJ indictment. Throughout the conspiracy periods, Kent Thiry was the Chairman and CEO of DaVita.

18.    Defendant United Surgical Partners Holding Company, Inc. is a company organized and existing under the laws of Delaware with its principal place of business in Dallas, Texas. United Surgical Partners Holding Company, Inc. is a wholly owned subsidiary of Defendant Tenet.

19.    Defendant United Surgical Partners International, Inc. is a company organized and existing under the laws of Delaware with its principal place of business in Dallas, Texas. United Surgical Partners International, Inc. is a wholly owned subsidiary of Defendant Tenet.

20.    Defendant Tenet Healthcare Corporation ("Tenet") is a company organized and existing under the laws of Nevada with its principal place of business in Dallas, Texas. Tenet owns and operates outpatient medical facilities throughout the United States. Tenet is the parent corporation of USPI.

21.    Defendants United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation are collectively referred to as "USPI." USPI owns and operates outpatient medical care facilities across the United States and employs individuals to operate its business at its headquarters location and at other location across the United States. Upon information and belief, USPI is referenced as "Company A" in the DOJ indictment.

22.    John Doe 1 was a company organized and existing under the laws of Delaware with its principal place of business in San Francisco, California. John Doe 1 was a healthcare

company that operated across the United States and employed individuals to operate its business at its headquarters location.

23.     Upon information and belief, various companies and individuals not made defendants in this complaint participated as co-conspirators in the alleged conspiracies, and performed acts and made statement to further the conspiracy.

## Factual Allegations

### Conspiracy Between SCA and USPI

24.     SCA and USPI are competitors in the recruitment and retention of senior-level employees in the outpatient medical care facility market across the United States.

25.     Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown, SCA and USPI entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.

26.     The conspiracy between SCA and USPI consisted of a continuing agreement, understanding, and concert of action to allocated senior-level employees by not soliciting each other's senior-level employees across the United States.

27.     SCA and USPI participated in meetings, conversations, and communications to discuss the solicitation of each other's senior-level employees, and agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees. For example, on or about May 14, 2010, the CEO of USPI emailed other employees of USPI that "I had a conversation w [Andrew Hayek] re people and we reached agreement that we would not approach each other's proactively."

28.     SCA and USPI instructed certain executives, employees, and recruiters to avoid soliciting senior-level employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee with USPI told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list." On or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [USPI] and [DaVita] are off limits to SCA." Similarly, on or about July 17, 2017, a human resources employee at USPI who believed a candidate was employed by SCA e-mailed a recruiting coordinator stating that the candidate "look[ed] great," but that she "can't poach her."

29.     SCA and USPI monitored one another's compliance with the no-poach agreement by requiring senior-level employees of SCA and USPI who applied to the other company to notify their current employer that they were seeking other employment in order to be considered. For example, on or about October 16, 2015, Andrew Hayek emailed a human resources executive at SCA: "Putting two companies in italics ([USPI] and [DaVita]) – we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking." Thus, the agreement not to solicit one another's employees also included a component that barred each company from even interviewing a potential candidate who applied of their own volition, unless the current employer was notified and approved of the application.

30.     This conspiracy was run by the headquarters operation of each company. In this industry senior level employees are highly mobile given compensation levels and the market for recruiting and hiring at the levels covered by the no-poach agreement is nationwide in scope.

31.     SCA and USPI kept their no-poach agreement concealed from the senior-level employees. When they came across a senior-level employee candidate for employment, SCA and USPI sometimes instructed the human resources personnel considering the candidate that they would proceed only if the employee let their current employer know of their interest in the position. For example, on or about November 1, 2013, USPI employees discussed whether to interview a candidate who was currently working at SCA in light of the "verbal agreement with SCA to not poach their folks . . . ." The CEO of USPI told the senior human resources employee that, "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell [Andrew Hayek] that I'm ok." The senior human resources employee at USPI commented, "Yikes, she is not going to want to do that. But I will check."

32.     SCA and USPI monitored and alerted one another about instances of recruitment of employees by the other, and took steps to remedy such violations of their no-poach agreement. For example, on or about December 8, 2015, the CEO of USPI informed Andrew Hayek "Just wanted to let you know that [a recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." Andrew Hayek instructed other executives of SCA: "We should continue to flag [USPI] on our 'do not call' list to recruiters – is OK if we get an inbound inquiry and the leader has communicated within [USPI] that they want to leave, but outbound calls should not be occurring."

**Conspiracy Between SCA and DaVita**

33.     SCA and DaVita are competitors in the recruitment and retention of senior-level employees across the United States.

34.     Prior to the conspiracy period, opportunity to conspire fomented when executive-level personnel migrated from DaVita to SCA. For instance, before becoming CEO of SCA in

May 2008, Andrew Hayek was the President of DaVita VillageHealth (a DaVita program brand focused on kidney disease). Similarly, Michael Rucker, who acted as Chief Operating Office of SCA during the conspiracy period, left his position as Divisional Vice President of DaVita and started with SCA in September 2008.

35.    Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates unknown at this time, SCA and DaVita entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.

36.    SCA and DaVita also participated in meetings, conversations, and communications to discuss the solicitation of each other's senior-level employees, and agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees. For example, on or about October 20, 2014, Kent Thiry emailed Andrew Hayek the following: "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks."

37.    SCA and DaVita instructed certain executives, employees, and recruiters to avoid soliciting senior-level employees of each other's companies. For example, on or around December 12, 2015, a senior human resources executive at SCA emailed a recruiter confirming that "[USPI] and [DaVita] are off limits to SCA."

38.    SCA and DaVita monitored compliance with the no-poach agreement by requiring each other's senior-level employees to notify their current employer that they were seeking employment for their applications to be considered. For example, on or about October 16, 2015, Andrew Hayek e-mailed SCA's human resources executive, as alleged above, confirming that, as with USPI, for DaVita, SCA could "recruit junior people (below Director),

but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."

39.     SCA and DaVita kept their no-poach agreement concealed from the senior-level employees. When they came across a senior-level employee candidate for employment, SCA and USPI sometimes instructed the human resources personnel considering the candidate that they would proceed only if the employee let their current employer know of their interest in the position. For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DaVita that she could not recruit from DaVita, with the exception of "candidates [who] have been given explicit permission by their employers that they can be considered for employment with us."

40.     SCA and DaVita also alerted one another about instances of recruitment of employees and took steps to remedy those violations of their no-poach agreement. For example, on or about June 13, 2016, an employee of SCA relayed a recruitment noting that "I thought there was a gentleman's agreement between us and [DaVita] re: poaching talent." An SCA executive replied, "There is. Do you mind if I share with [Andrew Hayek], who has most recently addressed this with [Kent Thiry]." Andrew Hayek then relayed the instance of recruitment to Kent Thiry who replied that he "[w]ill check it out."

41.     This agreement not to solicit or hire each other's employees between SCA and DaVita lasted at least until 2017. On or about April 7, 2017, Andrew Hayek was contacted by a consultant regarding his interest in a candidate employed by DaVita, and Andrew Hayek responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave [DaVita] – that's the relationship that we have with [DaVita]." The consultant responded that he was "glad you arrived at that agreement with [Kent Thiry]."

42.     The personnel of SCA ranking facility-CEO level and up convened monthly or quarterly meetings on a regional basis. The same was true for DaVita's operations directors. Annually, SCA and DaVita conducted national meetings where leadership personnel got together to make sure that surgical center operations were uniform and consistent throughout all locations, creating a cookie-cutter operation.

**Conspiracy between DaVita and John Doe 1**

43.     DaVita and John Doe 1 were competitors in the recruitment and retention of employees.

44.     Beginning at least as early as April 2017 and continuing until at least as late as June 2019, the exact dates being unknown to the Grand Jury, in part in the District of Colorado and elsewhere, DaVita and Thiry entered into and engaged in a conspiracy with John Doe 1 to suppress competition between them for the services of employees by agreeing that John Doe 1 would not solicit DaVita's employees. The conspiracy engaged in by DaVita, Thiry, and their co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

45.     The conspiracy consisted of a continuing agreement, understanding, and concert of action among DaVita, Thiry, and their co-conspirators, the substantial terms of which were that DaVita and John Doe 1 would allocate employees by John Doe 1's not soliciting DaVita's employees.

46.     For the purpose of forming and participating in the conspiracy, DaVita, Thiry, and their co-conspirators, among other things, did the following:

(a) participated in meetings, conversations, and communications with co-conspirators to discuss the solicitation of employees of DaVita by John Doe 1;

(b) agreed during those meetings, conversations, and communications that John Doe 1 would not solicit DaVita employees—for example, on or about April 16, 2017, the CEO of John Doe 1 emailed Thiry that "You also have my commitment we discussed that I'm going to make sure everyone on my team knows to steer clear of anyone at DVA and that I'll come back to you and talk before ever get anywhere near a point that could contemplate someone else.";

(c) reassured each other of compliance with the agreement that John Doe 1 would not solicit employees of DaVita—for example, on or about February 22, 2018, the CEO of John Doe 1 emailed Thiry: "I took our conversations last year to heart around how it felt to you/DVA when [DaVita employee] left—our relationship matters far more to me than any potential addition to our team. Although there have been 4 people that have reached out over the past year to probe about opportunities, I have not pursued those conversations (always being clear that it was about not having a clear need which was accurate to some extent).";

(d) monitored compliance with the agreement that John Doe 1 would not solicit employees from DaVita by requiring employees of DaVita who reached out to John Doe 1 to notify DaVita that they were seeking other employment in order to be considered by John Doe 1;

(e) informed employees of DaVita who were candidates for employment at John Doe 1 that they were required to provide such notice to DaVita—for example, on or about February 22, 2018, the CEO of John Doe 1 emailed Thiry about a current DaVita employee: "We do happen to have openings in her area and they could be a good fit. However, I told her that given my relationship with the Village, I would only discuss

13

with her if she told her manager explicitly that she would like to talk to me about a role and that I would talk to you about it before I would discuss with her (I framed it in a positive way about me making sure I'm doing the right thing as someone who cares about the Village and an investor in Village as well).”; and

(f) refrained from soliciting DaVita employees—for example, on or about July 20, 2017, the CEO of John Doe 1 texted a former DaVita employee: “Also please let me know if you think of any great folks (nobody currently at DaVita) that would be worth talking to.” And on or about April 20, 2017, The CEO of John Doe 1 texted a former colleague for recommendations for customer service employees and, referring to a DaVita-owned pharmacy company, stated “But nobody at Rx today. Promised Kent!”

### Competition for Employees
### in the Outpatient Medical Care Industry

47.     Defendants are top participants in the operation of outpatient medical care facilities, and are some of the largest employers in the outpatient medical care industry. Throughout the United States, SCA operates approximately 230 outpatient medical care facilities, DaVita operates approximately 2,800 outpatient medical care facilities, and USPI operates approximately 550 outpatient medical care facilities and other facilities. Prior to the conspiracy periods, Defendants competed with each other to hire and retain employees throughout the United States. Lateral hiring is a key form of competition between SCA and DaVita, and between SCA and USPI. There is a high demand for and limited supply of director-level and above employees who have experience in the outpatient medical care industry.

48.     Defendants both actively recruit these employees and also receive direct applications from such qualified individuals. Direct solicitation of lateral employees is a highly efficient and effective way to compete for qualified employees. For instance, in 2006, just before

14

Plaintiff Peña started working for DaVita, he was working for another outpatient medical care provider, Fresenius. A DaVita employee directly solicited Plaintiff to work for DaVita while he was still working for Fresenius, and Plaintiff accepted the offer.

49.     A competitive labor market is one where there are many potential employers for a given type of worker.  Competition for highly skilled talent in the management and operation of outpatient medical facilities benefits employees because it increases the available job opportunities and improves the employee's ability to negotiate for a better salary and other terms of employment. Absent collusion, Defendants previously had been able to take advantage of the efforts their fellow outpatient medical service providers have expended in identifying and training their employees. Without the option of poaching lateral talent, the hiring firm must invest significant resources in identifying, assessing, and training new employees.

50.     The threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale, productivity, and retention. If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, or reduce their productivity and morale.

51.     Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading (and unplanned) pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises. Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all employees.

15

52.     The availability of desirable positions at competing employers also forces employers to reactively increase compensation to retain employees who are likely to join a competitor. This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its employees by increasing compensation levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

53.     Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

54.     Defendants' no-poach restrictions precluded this information from reaching senior-level employees at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors. Employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. Senior-level employees could have also shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.

55.     Defendants' conspiracy restrained competition for senior-level employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor

markets. This disruption and suppression of compensation was not limited to particular individuals who would otherwise have been solicited or sought to change employers. The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' senior-level employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

### Effects of No-Poach Agreements

56.     Defendants are some of the largest employers in the outpatient medical care industry in the United States. SCA owned and operated outpatient medical care facilities across the United States with quarterly revenues exceeding $279 million. SCA has 10,000 employees in over 200 ambulatory surgery centers in 35 states and perform 1 million procedures a year. SCA employed individuals to operate its business at its headquarters locations and at other locations across the United States.

57.     Over a period spanning several years, Defendants entered into no-poach agreements to eliminate competition among them for employees. These agreements were executed and enforced by the companies' senior executives and personnel in the recruiting and human resources department. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies and resulted in injury to the Plaintiff and member of the proposed Class.

### Effects on Interstate Commerce

58.     During the relevant time period, Defendants employed members of the Proposed Class throughout the United States, including in this judicial district.

59.     The Conspiracy substantially reduced competition for labor in the outpatient medical care industry, and suppressed the efficient movement and compensation of senior-level

employees, harming Plaintiff and members of the Proposed Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

60.     Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

**Defendants Fraudulently Concealed Their Conspiracy**

61.     During the Class Period (defined below), knowledge of the agreements was closely held by senior executives and recruiters of the Defendant companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions and private email communications. Plaintiff and members of the Proposed Class did not and could not have discovered through the exercise of reasonable diligence that Defendants were engaged in secret no-poach agreements.

62.     Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their senior-level employees until when the DOJ publicly announced the Grand Jury Indictment against SCA on January 7, 2021. Plaintiff was not aware of the no-poach agreements before that time.

63.     Defendants did not put their agreements in writing to avoid detection. The knowledge of the no-poach agreements was held in secret by the executives and a small number of recruiters and Human Resources personnel so that the no-poach agreements can be maintained and executed as intended while being kept confidential. Defendants discussed, monitored,

informed each other issues arising from the no-poach agreement verbally or through confidential email communication concealed from the employees and the public.

64. Defendants' secretive maintenance and enforcement of the no-poach agreements deliberately and effectively concealed their misconduct until DOJ's Grand Jury Indictment revealed it.

65. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

### Class Allegations

66. Plaintiff brings this action on behalf of himself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as follows:

> All natural persons who were employed as senior-level employees in the United States for one or more of the following: (a) from May 1, 2010 to October 31, 2017 for Surgical Care Affiliates, LLC or one of its subsidiary outpatient medical care centers; (b) from May 1, 2010 to October 31, 2017, for USPI or one of its subsidiaries; or (c) from February 1, 2012 through June 30, 2019, for DaVita or one of its subsidiary outpatient medical care centers. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants who participated in the conspiracy described in the Complaint.

67. Plaintiff believes there are thousands of members of the Class dispersed all over United States, making joinder of all members of the Class impracticable.

68. The Class is precisely ascertainable from Defendants' records. Based upon these records and expert analysis, Plaintiff will determine which job titles constituted senior-level employees, and therefore was subject to and was injured by the conspiracy among Defendants.

69. Plaintiff's claims are typical of the claims of the Proposed Class and Subclasses as they arise out of the same course of Defendants' conduct and the same legal theories.

70. Plaintiff will fairly and adequately represent the interests of the Proposed Class and Subclasses and has no conflict with the interests of the Proposed Class or Subclasses.

71. Plaintiff has retained counsel competent and experienced in both antitrust and class action litigation.

72. Numerous questions of law and fact common to each Class member exist that predominate over questions affecting only individual members, including, but not limited to:

    a. whether Defendants agreed not to solicit or hire each other's senior-level employees;

    b. whether such agreements were per se violations of the Sherman Act;

    c. whether Defendants have fraudulently concealed their misconduct;

    d. whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for their senior-level employees;

    e. whether Plaintiff and the Class suffered antitrust injury as a result of Defendants' agreements; and

    f. the type and measure of damages suffered by Plaintiff and the Class.

    g. the nature and scope of injunctive relief necessary to restore a competitive market.

73. Defendants have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

74. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of

numerous individual actions, the duplication of discovery, effort, expense, risk of inconsistent judgments, and the burden of the courts that individual actions would create.

### Claim for Relief
### (Violation of The Sherman Act, § 1)

75.     Plaintiff realleges and incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

76.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's senior-level employees, thereby fixing and suppressing Class members' compensation.

77.     Defendants' agreements have included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiff and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for senior-level employees.

78.     Defendants' combinations and conspiracy injured Plaintiff and the members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

79.     Plaintiff acquired his wages, salary, or compensation directly from DaVita, paying for them through his labor.

80.     Defendants' conduct and agreements are per se violations of Section 1 of the Sherman Act.

### Prayer for Relief

WHEREFORE, Plaintiff, individually and on behalf the proposed Class of similarly situated persons, respectfully seeks the following relief:

A. An order certifying this action as a class action under Fed. R. Civ. 23(a) and (b)(3), defining the Class as requested herein, finding that Plaintiff is a proper representative of the Class requested herein, and appointing Plaintiff's counsel as Class Counsel.

B. The conduct alleged herein be declared, adjudged, and decreed to be per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of Defendants' unlawful conduct;

C. Plaintiff and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees and expenses as well as prejudgment and post-judgment interest as provided by law; and

D. Injunctive relief, declaring the no-poach agreement among Defendants unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward; and

E. For such other and further relief as the Court may deem just and proper.

**Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated: July 16, 2021                             Respectfully submitted,

                                                 */s/ Kenneth A. Wexler*
                                                 Kenneth A. Wexler
                                                 Justin N. Boley

22

**WEXLER WALLACE LLP**
55 West Monroe St., Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com

Daniel E. Gustafson
Daniel C. Hedlund
Catherine K. Smith
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
csmith@gustafsongluek.com

David M. Cialkowski
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com

Jeffrey A. Leon
Robert J. Pavich
**PAVICH LAW GROUP, P.C.**
Inland Steel Building
30 West Monroe Street
Suite 1310
Chicago, Illinois 60603
jleon@pavichlawgroup.com
rpavich@pavichlawgroup.com